30 C.C.P.A.(Patents)

## In re HELGASON.

Patent Appeal No. 4685.

Court of Customs and Patent Appeals.
May 18, 1943.

Robert L. Kahn, of Chicago, Ill., for appellant.

W. W. Cochran, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

·This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming that of the examiner rejecting all the claims, six in number, embraced in appellant's application for a patent on coils. Claims 1 to 4, inclusive, are drawn to the article and claims 5 and 6 to a method of making it.

As illustrative, we quote claims 1, 3, 4, and 5:

"1. In a multi-layer high tension coil, an intermediate layer of wire turns, an end turn having a lead connection therefrom, an insulating tube disposed transversely of the wire turns and along said layer and immediately adjacent thereto and extending the length thereof, and a lead wire running from said lead connection directly into and through said tube, said tube being completely separable from said lead wire."

"3. In a multi-layer high tension coil, a plurality of layers of wire turns, an intermediate layer having a definite length, sheet insulation between said layer and adjacent layers and extending beyond the end turns thereof, said layer also having a lead connection at one of the end turns thereof, an insulating tube immediately adjacent said layer and transversely thereof for substantially the width of said sheet insulation, and a lead wire from said lead connection extending into said tube right under the end turn and extending through the tube.

."4. The structure of claim 3 wherein said tube is slotted from the end nearest the lead to the point where the lead goes into said tube.

"5. In the art of winding high tension coils, the method of providing lead insulation for an intermediate lead which consists of winding a wire layer with a lead connection at one of the end turns, disposing an insulating tube lengthwise of said layer and immediately adjacent thereto and threading a lead wire through said tube from said lead connection."

The references cited by the examiner are the following patents: Driftmeyer, 1,968,600, July 31, 1934; Lee, 1,307,867, June 24, 1919; Franz, 2,154,070, April 11, 1939; Bullimore (Br.), 385,721, Jan. 5, 1933.

Each of the patents so cited is in the same field of art—electrical coil—as the application at issue. It is obvious from their respective decisions that both tribunals of the Patent Office regarded the Driftmeyer patent as being the principal reference. The board expressly so stated, but approved the others as secondary references, disclosing certain pertinent features alluded to in the arguments and in the examiner's statement.

Appellant's description of his claimed invention as set forth in his brief before us is made in large part in connection with a description of the Driftmeyer patent and is argumentative in character, certain differences in structure and method being pointed·out, and his description of the other references is also accompanied by and ·intertwined with argument. So, we deem it proper to quote the examiner's descriptions. Their accuracy is not challenged and they are free from argumentative matter.

In his statement following the appeal to the board the examiner said:

"The application concerns structure and method providing insulation for the terminal or lead wires of multi-layer electrical coils.

"Such terminal wires are normally connected to the ends and sometimes to intermediate points of the fine wire of a coil, the intermediate lead wires then passing between layers to an end of the coil. These lead wires must be insulated from adjacent wire layers. In addition the layers of wire are usually separated from each other by layers of paper, particularly if high potential differences between coil layers exist.

"For attaching each lead, applicant provides a lead connection 15 during the winding operation * * *, this connection fastened to the coil wire and terminating adjacent an end of the coil. An insulating conduit or tube having a passageway for a lead wire is then laid across the winding layer, a separator paper layer is wrapped over the tube and underlying wire layer, and the winding is resumed. A filler may be used in the tube if necessary to prevent it from collapsing under the tension of the succeeding wire layer.

"When the winding is completed, and the coil has been separated from others, if several were wound side by side in the multiple-coil process common in this art, the fillers, if any, are removed. A lead 20 is then inserted through each tube. The free end of the connection 15 is soldered to 20 as shown in Fig. 3. Lead 20 is then drawn back to the Fig. 4 position, and the coil given the usual impregnation."

Concerning the reference disclosures, the examiner stated:

"Driftmeyer 1,968,600 discloses a coil similar to applicant's, made by the same multiple-coil process, with interlayer paper insulation, and with both end and intermediate terminal leads. Instead of having the coil leads emerge at different layers, Driftmeyer assembled them at one layer, disclosed as near the outside. Instead of using several separate insulating conduits or passageways, one at each layer, where a connection is made, Driftmeyer uses a single member having 'a plurality of spaced passageways 15' to take care of all leads and connections * * *. This member 'preferably will be formed of corrugated paper', but obviously may be any assembly of conduits (tubes) providing passageways. Franz 2,154,070, Bullimore (Br.) 385,721.

"Both of these references disclose coils similar to applicant's in which the intermediate leads, surrounded by insulation, are brought to a coil end at the layers to which the various connections are made. Insulation surrounds each lead. By use of a flat terminal, with a flat passage-way or tube formed by the two strips 24 and 29, Franz uses less space than applicant, and anchors the lead securely in the coil by means other than the tensile strength of the fine coil wire, thus overcoming the danger of breaking the fine coil wire present in applicant's structure. Bullimore's tube or passageway for each lead 3 is formed by the underlying insulating strip 2 and overlying insulating layer, as described at page 3, lines 85-108.

"Lee 1,307,867 shows a lead 22 inclosed in an insulating 'tube 23' leading to the coil end between underlying coil layers 15 and overlying coil layers 19."

It is true, of course, that no one of the references embraces all the features of appellant's claims, and the sole question is whether invention was involved in the differences in structure (which necessarily resulted in differences of method in making the article) that distinguish appellant's claims from the prior art.

In his brief before us appellant said, inter alia:

"For reasons evident later, applicant desires to take up claims 3 and 4 first. These claims specify 'in a multi-layer high tension coil'. As pointed out before, the use of the word 'high tension' is justified by the three references to page 3 of the record, this being applicant's original specification (Stipulation filed May 15, 1942), as well as by the general tenor of this page. The claims further specify 'a plurality of layers of wire turns, an intermediate layer having a definite length'. This portion of the two claims clearly specifies an intermediate layer between other layers. The claims further specify that this intermediate layer has a lead connection at one of the end turns thereof and then goes on to point out the insulating tube all the way across the coil and the lead wire within the tube. Claim 4 then brings in the slotting of the tube to permit the lead wire (see applicant's drawing, Record page 7) to be pulled up and shown in Figure 4.

"Now referring to claims 1 and 2, the Board of Appeals considered claim 1 as illustrative of all the claims. Then it proceeded to point out that no other layers of wire except an intermediate layer is recited in claim 1. Apart from the erroneous reasoning in regard to this point it is submitted that it is unfair to consider claim 1 as illustrative when claim 3 definitely calls for an intermediate layer and other layers as well.

"Claims 1 and 2 call for an intermediate layer in a multi-layer high tension coil. It is submitted that the introductory expression 'in a multi-layer high tension coil' must be considered since the significant adjective 'intermediate' in the main body of the claim would be meaningless unless 'multi-layer' were part of the structure. In other words, it is submitted that the use of this language is equivalent to calling for a combination of a layer of wire turns with additional layers on both sides of the first layer so that one layer becomes an intermediate layer."

If we have understood appellant's argument aright, it is to the effect that the introductory clauses of the claims (expressed, for example, in claim 3) "In a multi-layer high tension coil," must be considered as a limitation in the claim; that if so considered in connection with the language (appearing in claim 3 and present by implication in claim 4) reading, "A plurality of layers of wire turns, an intermediate layer having a definite length," it renders those claims patentable over the prior art, and that the latter language or limitation must, in effect, be regarded as being present in claims 1 and 2, because of the phrase "multi-layer high tension coil."

We confess that appellant's argument upon the point is somewhat obscure but its purport seems to be as stated. Incidentally, it may be said that it might be deduced from appellant's argument at one point in his brief that he thought it was held, in effect, by the Patent Office tribunals that he had no right to make a claim calling for a high tension coil, because the term "high tension" (which was inserted in claim 1 by amendment) was not used in the original disclosure. Of this we deem it sufficient to say that we do not understand the language used by the tribunals to have been intended to have such interpretation. We think from a careful reading of the decisions that the language used

concerning this phase of the case is given the correct interpretation in that part of the brief of the Solicitor for the Patent Office before us, reading: "* * * neither the examiner nor the Board of Appeals held that the term 'high tension' had no basis. What the examiner did say was that, if it did have a basis, it was only upon an assumption which was equally applicable to the coils of the references. The Board of Appeals came to substantially the same conclusion in making the statement that 'Such limitations are therefore not significant for the reason of record.'"

So far as the "high tension" phase of the claims is concerned, we understand the holdings below to have meant nothing more than that even if considered as a limitation it had no patentable significance in the instant case, either standing alone or taken with other limitations in the claims.

It is not insisted by appellant that he is entitled to have claims 1, 2, 5, and 6 allowed unless claims 3 and 4 are found to be patentable. So, we proceed now to consider appellant's contention respecting claim 3 (from which claim 4 differs only in that it has a limitation respecting the tube being slotted) and we here quote from his brief a summarization of his argument, as follows:

"The Patent Office has taken the position that as regards Driftmeyer, there is no invention in using an insulating tube instead of corrugated paper and disposing this tube between adjacent intermediate wire layers. It is submitted that this change cannot be made in Driftmeyer because of the new and unusual results obtained namely, the elimination of the potential strain in the lead wire along the coil side.

"It should be remembered that Driftmeyer uses a corrugated paper structure to provide a plurality of channels adjacent each other. Driftmeyer needs the plurality of channels adjacent each other since he puts all his leads together on the outside. In distinction to this, applicant's construction aims to separate the leads from each other so that only one tube would be used between two intermediate adjacent wire layers. The mere moving of the corrugated paper from the outside to an inside point in the coil in the Driftmeyer patent would be useless since some leads would go along the coil side. In applicant's case only one lead is directed between adjacent wire layers at any one

place so that there is no utility for corrugated paper or any other structure providing a plurality of parallel channels.

"It is submitted therefore that these two changes in Driftmeyer, namely, the use of a single tube instead of a multi-channel structure and the moving of this tube down to an intermediate place in the coil are not warranted by anything in the patent.

"With regard to the British patent to Bullimore, the claims differentiate thereover by clearly specifying a tube going the full length of the coil and through which tube the lead is threaded. In view of the preceding remarks as to shortcomings of this reference, it is submitted that the change to a tubular structure is not suggested in the art and is not obvious.

"It is believed that Driftmeyer and Bullimore cannot possibly be combined together. In Driftmeyer the emphasis is on the multi-channel lead retaining member outside of all the windings. In Bullimore the emphasis is on a prefabricated lead which may be disposed anywhere within the coil. It is impossible to combine the two references since neither one is susceptible to any reasonable and proper modification in view of the other.

"The remaining two references of record have been adequately covered in the previous discussion of the art. Since every one of the claims clearly points out the invention it is believed that the previous discussion with regard to all the references of record clearly applies to the claims."

It will be noted that appellant first points out, in effect, that in the Driftmeyer patent the channels are adjacent each other, while appellant's construction aims to separate the leads so that only one tube would be used between two intermediate adjacent wire layers and it is urged, in effect, that the use of the single tube and the moving of the tube down to an intermediate place in the coil distinguishes from Driftmeyer.

With respect to the feature of separating the leads from each other, it may be said that while appellant's drawing shows separated leads, there is no limitation in any of the appealed claims which defines that feature. We are unable to determine from the decisions of the respective tribunals of the Patent Office to what extent the feature was emphasized before them.

It is not specifically discussed in the statement of the examiner nor in the decision of the board and, it may be added, that it is not very clearly identified in the reasons of appeal before us.

In the brief of the Solicitor for the Patent Office before us the point is discussed as follows:

"Appellant, after discussing the patent to Driftmeyer, points out that in Driftmeyer the channels are adjacent each other. Appellant then presents the argument that, in contradistinction to this, applicant's construction aims to separate the leads from each other. Appellant's argument in this respect appears to be based upon limitations which are not in the claims. Although it is true that the applicant's drawing shows leads separated from each other, nevertheless it will be observed that all of the appealed claims call for one lead only, and, accordingly, the feature of separated leads does not appear positively to be involved in any of the appealed claims.

"It is well settled that limitations not in the claims need not be considered even though the application disclosure would support patentable claims had they been made."

In support of the stated rule numerous decisions are cited including McCarty v. Lehigh Railroad Co., 160 U.S. 110, 16 S.Ct. 240, 40 L.Ed. 358, cited by us in many cases, one being that of In re Fischer, 113 F.2d 492, 27 C.C.P.A., Patents, 1414.

We do not deem it proper under the circumstances of the case to express any view as to whether the limitation, had it been definitely stated in the claims, would have rendered them patentable. The fact that it was not so embraced renders it appropriate to apply the rule above stated.

The "one tube" feature emphasized before us is another element not specifically discussed by the tribunals of the Patent Office, but, being embraced in the claims, it must be assumed that it was duly considered by them.

One difficulty confronting appellant respecting this feature is that while all the claims refer to one tube, no one of them is positively limited (as expressed in the brief of the Solicitor for the Patent Office before us) to "one tube and no more than one." Whether a claim so limited would read upon appellant's disclosure might be questioned, but, however that may be, there is no teaching in appellant's

application that the elimination of some of the tube elements shown in the prior art produces any new or unexpected result, and the claims do not in terms exclude more than one tube element. See In re Sampsel, 95 F.2d 253, 25 C.C.P.A., Patents, 965.

The feature of moving the tube down to an intermediate place in the coil concededly is not shown in the Driftmeyer patent, but both Bullimore and Franz show the bringing out of leads between the layers of a coil, and we argee with the tribunals of the Patent Office that what appellant did in placing the tube at an intermediate point in the coil is not inventive in view of the teachings of those patents.

Some other questions of an incidental nature are referred to in appellant's brief but they are not matters which affect our conclusion in the case and we need not discuss them.

The decision of the board is affirmed.

Affirmed.